IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL SHANE WILMOTH                                       PLAINTIFF

        v.                            Civil No. 10-5048

ARAMARK CORRECTIONAL SERVICES, LLC;
and BARBARA HARDWICK                                  DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed by the Plaintiff, Michael Shane Wilmoth (Wilmoth), pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis.*

Wilmoth is currently incarcerated in the Varner Unit of the Arkansas Department of Correction (ADC) in Grady, Arkansas. The events that are the subject of this case took place when Wilmoth was incarcerated in the Benton County Detention Center (BCDC) in Bentonville, Arkansas. Specifically, Wilmoth maintains Defendants failed to provide him with an adequate diet.

Originally, Wilmoth asserted claims against a number of individuals employed at the BCDC. However, a settlement was reached as to those claims and the Defendants were dismissed on June 27, 2012. This left only the claims against ARAMARK (ARAMARK) Correctional Services, LLC, the food service provider, and Barbara Hardwick (Hardwick), the assistant food services director. A motion for summary judgment has been filed on behalf of Defendants ARAMARK and Hardwick (Doc. 96).

To assist Plaintiff in responding to the summary judgment motion, a questionnaire was prepared. Plaintiff filed his response to the motion (Doc. 152). Defendants submitted a reply brief (Doc. 158). The motion is now ready for decision.

### 1. Background

Wilmoth was booked into the BCDC on October 12, 2007. *Plaintiff's Response* (Doc.

152)(hereinafter *Resp.*) at ¶ 1.  He remained incarcerated there until his transfer to the ADC on September 30, 2008.  *Id.* at ¶ 3.

On January 9th, Wilmoth submitted a grievance about the food portions getting too small.  *Resp.* at ¶ 4.  He stated he was not getting adequate calories.  *Id.*  Captain Petray informed Wilmoth that the portions were the same.  *Id.*  On January 30th, Wilmoth complained that the breakfast tray portion was too small and he had no jelly on his tray.  *Id.* at ¶ 5.  Captain Petray responded that the food trays met the requirements.  *Id.*

On February 12th, Wilmoth complained that he was not receiving 2300 calories per day and the trays had portions that were too small.  *Resp.* at ¶ 5.  In response, Captain Petray said the trays met the required amount.  *Id.*

Wilmoth submitted a grievance on April 21, 2008, stating that the beans he was served were spoiled and not eatable.  *Resp.* at ¶ 7(A).  He said something needed to be done to replace the beans.  *Id.*  Captain Petray responded that he would check with the kitchen.  *Id.*  Wilmoth submitted a second grievance about the spoiled beans that day.  *Id.* at ¶ (7)(B).  Nothing was done to remove the beans from the trays or to replace them.  *Id.* at ¶ 7(C).

That same day, Wilmoth submitted a request for medical treatment.  *Resp.* at ¶ 7(D); (Doc. 152 at pg. 61).  He indicated that as a result of the spoiled beans he was vomiting, having stomach cramps, and had the "runs."  *Id.*  Wilmoth states that he and "many, many" other inmates were given medical treatment for issues caused by the spoiled beans.  *Resp.* at ¶ 7(D).

On April 23rd, Wilmoth submitted a grievance stating his boiled eggs were raw, for the second time that week, and he was not given any food to replace the bad food resulting in him being served less than 2300 calories per day.  *Resp.* at ¶ 8; (Doc. 152 at pg. 64).  In response, Captain Petray wrote that he had spoken to the kitchen.  *Resp.* at ¶ 9.

On April 24th, Wilmoth submitted a grievance saying he had gotten food poisoning after eating spoiled beans. *Resp.* at ¶ 10. Captain Petray responded that if he had a medical issue he needed to put in a medical request. *Id.* He also said the doctor made the medical decisions in the jail. *Id.* Finally, he said he had spoken to the kitchen about the beans. *Id.*

On May 5th, Wilmoth complained that since entering the jail he had lost 20 pounds. *Resp.* at ¶ 11; *see also* (Doc. 152 pg. 70). He stated he was not getting an adequate amount of nutrition. *Id.* In response, Captain Petray stated that Wilmoth was receiving the required nutritional amount of food. *Id.*

On May 6th, Wilmoth asked for the names of the kitchen staff stating he needed them for his § 1983 form to be submitted to the court. *Resp.* at ¶ 12. In response, Captain Petray stated ARAMARK was the company that ran the kitchen. *Id.*

ARAMARK was under contract to Benton County to provide meals to inmates at the BCDC. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 4 at ¶ 2. Barbara Hardwick was the assistant food service director for ARAMARK at the BCDC. *Id.* at ¶ 1.

The provision of food to inmates was the only act ARAMARK was responsible for at the BCDC. *Defts' Ex.* 4 at ¶ 20. Neither ARAMARK or Hardwick had any other duties in connection with the detention of inmates. *Id.*

According to Wilmoth, he and "many other inmates lost a lot of weight . . . due to . . . inadequate meals to maintain our health." *Resp.* ¶ 16. He maintains that many of the trays did not meet the caloric requirements. *Id.*

According to Hardwick, a certified dietician periodically set the menu for all meals served in the BCDC to ensure that the meals were nutritionally balanced and met caloric requirements

sufficient to sustain good health. *Defts' Ex.* 4 at ¶ 3.[1] The approved menus were entered into a computer using software that allowed ARAMARK to adjust the number of meals required daily. *Id.* at ¶ 6. Officials at the BCDC would notify ARAMARK on a daily basis of the amount of meals needed to be prepared. *Id.*

When notified of the number of meals needed, either Hardwick or some other ARAMARK employee would input that number into the computer program. *Defts' Ex.* 4 at ¶ 7. The program automatically calculated the types and amounts of food required to prepare the menu for that meal. *Id.*

The program calculated the precise quantities and types of food required including spices and condiments. *Defts' Ex.* 4 at ¶ 7. Either Hardwick or some other ARAMARK employee would print off the menu with the computer program's calculations and specifications. *Id.* at ¶ 8. The information was provided to ARAMARK employees who would then pull all of the necessary food products from storage. *Id.* at ¶ 9.

The trustees would prepare and serve the meals. *Defts' Ex.* 4 at ¶ 10; *Resp.* at ¶ 24. The trustees were closely and continually monitored by ARAMARK employees to ensure the food was properly prepared. *Defts' Ex.* 4 at ¶ 11. The trustees were then closely and continually monitored while serving the other inmates to ensure proper amounts of food were given to each inmate. *Id.* at ¶ 12.

Specific utensils were used to ensure that a full serving of each food item was easily and precisely measured. *Defts' Ex.* 4 at ¶ 13. For example, if the menu called for one-half cup of coleslaw, the coleslaw was served by using a one-half cup service piece. *Id.* If the menu called for

---

[1] Wilmoth maintains he was denied "all information concerning the kitchen" when the Court denied his motions to compel. However, none of the motions to compel (Docs. 52, 59, 60, 61, and 69) sought information regarding the diets being served, the certification procedure, the procedures used to maintain portion control, or how inmate complaints regarding the diets were handled.

ten ounces of mashed potatoes, a ten-ounce ladle, along with a tool to scrape the top of the ladle, would be used to ensure precisely ten ounces were served. *Id.* Variations of the menu did exist and were prepared in the same manner for those inmates requiring a special diet such as a diabetic diet. *Id.* at ¶ 15.

According to Defendants, the procedures in place did not allow for judgment or discretion on the part of the trustees serving the food. *Defts' Ex.* 4 at ¶ 13. Wilmoth, however, asserts that the "trustees did have full discretion or judgment." *Resp.* at ¶ 28.

Defendants maintain that each inmate was served what was called for by the approved menu. *Defts' Ex.* 4 at ¶ 14. According to Wilmoth, the inmates on many occasions were served smaller portions than called for on the approved menu. *Resp.* at ¶ 29. As noted previously, Wilmoth maintains that if inmates were served spoiled beans or raw food, the food was not replaced. *Id.*

Defendants concede there were, on one occasion, complaints about the unusual taste of beans being served. *Defts' Ex.* 4 at ¶ 17. After confirming the unusual taste, inmate trays were reissued with new beans in the quantities called for by the menu. *Id.* Similarly, Defendants indicate that on one occasion, there were complaints about undercooked eggs. *Id.* at ¶ 18. Defendants indicate the eggs were replaced and redistributed to the inmates. *Id.* Wilmoth states spoiled beans and raw eggs were served on more than one occasion and the trays were not reissued. *Resp.* at ¶¶ 32-33.

During Wilmoth's incarceration at the BCDC, Dr. Huskins' opinion was that he was in good overall health. *Defts' Ex.* 3 at ¶ 9. Wilmoth agrees Dr. Huskins said this; however, Wilmoth states that once he was transferred to the ADC he was treated for injuries and health problems Dr. Huskins said he did not have. *Resp.* at ¶ 34. Wilmoth does not indicate what injuries or health problems he is referring to. *Id.*

As a result of the food he was served, Wilmoth states he had food poisoning. *Resp.* at ¶ 36.

He also maintains he submitted other grievances about the food. *Id.* With respect to his weight, Wilmoth states his average weight is between 178 and 192. *Id.* at ¶ 37. While at the BCDC, he asserts he lost approximately twenty pounds. *Id.* While Wilmoth was housed in the isolation block at the BCDC, he asserts he was never allowed time on the exercise yard. *Id.*

When asked how Hardwick violated his constitutional rights, Wilmoth responded:

Hardwick was contacted each time there was spoiled beans and undercooked foods. She told the officers to serve the trays and never corrected the problem. She showed deliberate indifference to the health and well being of all inmates. She works in the food service field and knows food poisoning can be a life [threatening] illness. Yet she still made a knowing decision that the beans was spoiled and the eggs was raw to feed these to the inmate. Therefore this was deliberate indifference to my life, my health, and well being.

*Resp.* at ¶ 39.

### 2. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

Defendants maintain they are entitled to judgment in their favor for a number of reasons. First, they maintain § 1983 claims do not apply to ARAMARK or its employees.  ARAMARK asserts it is a contracting private service provider with no penal responsibilities.  Second, they maintain all claims against ARAMARK should be dismissed because there is no respondeat superior liability.  Third, Defendants argue that Plaintiff's unsubstantiated claims, even if true, are not significant enough to be constitutionally actionable.  Fourth, Defendants assert that Plaintiff did not suffer an injury sufficient enough to support a claim of constitutional dimension.

### (A).  Right to Adequate Nutrition

The Eighth Amendment requires inmates to be provided with "nutritionally adequate food." Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992).  Failure to provide adequate nutrition can constitute deliberate indifference.  Id.; see also Hartsfield v. Colburn, 491 F.3d 394, 396 (8th Cir. 2007)(Deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety). "Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate.  An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to an inmate." Schaub v. VonWald, 638 F.3d 905, 914-15 (8th Cir. 2011)(internal quotation marks and citations

omitted).

"The deprivation of food constitutes cruel and unusual punishment [within the meaning of the Eighth Amendment] only if it denies a prisoner the minimal civilized measure of life's necessities." Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1993)(internal quotation marks and citations omitted).

> To prevail on an Eighth Amendment claim, an inmate must prove both an objective and a subjective element. First, the alleged deprivation, objectively, must be sufficiently serious; the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities; or the prison official must incarcerate the inmate under conditions posing a substantial risk of serious harm. Second, the prison official, subjectively, must act with deliberate indifference to inmate health or safety.

Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998)(internal quotation marks and citations omitted).

**(B). State Action**

ARAMARK maintains it is simply a private food service contractor for a detention facility and has not been delegated penal responsibilities. It maintains it cannot be held liable under § 1983 because it is not a state actor. I reject this argument.

In West v. Atkins, 487 U.S. 42, 57 (1988), the Supreme Court concluded that a physician under contract to provide medical services to inmates at a state prison was a state actor because his function could fairly be held attributable to the state. The same reasoning applies here. Benton County has a constitutional obligation to provide nutritionally adequate meals to the inmates of the BCDC. Benton County has delegated this obligation to ARAMARK and ARAMARK contractually assumed this obligation. Jones v. Helder, 2011 WL 1194008 (W.D. Ark. March 8, 2011)(ARAMARK has assumed the obligation to provide nutritionally adequate diet to the inmates

of the Washington County Detention Center) ; Price v. Suarez No. 1:09-cv-0051, 2011 WL 635225 (D. Utah Feb. 11, 2011); Ingram v. Hall, 2010 WL 1727865, 7 (M.D. Tenn. March 31, 2010); Lucas v. Aramark Corrections Food Service, 2010 WL 59194, 1 (W.D. Ky. Jan. 5, 2010).

### (C).  Respondeat Superior Theory of Liability

Plaintiff does not contend Defendants are liable merely on a theory of respondeat superior liability.  Plaintiff maintains Defendants are directly liable for failing to supervise, direct, or control the actions of the subordinates who caused the injury.

On the record before me, I cannot say that Defendants are entitled to summary judgment. Defendants do not deny they prepared the menus, provided all food supplies, and "closely and continually" monitored the preparation of all food.  Nor have they denied that spoiled beans and raw eggs were served on different occasions. While they point out that the Plaintiff's weight varied from 178 to 192 pounds, they present nothing to dispute Wilmoth's claim that he lost twenty pounds.  I cannot say on the record before me that there is no basis on which Defendants may be held liable.

### (D). Complaints Too Inconsequential to be Actionable

Wilmoth maintains that the food portions were too small, were nutritionally inadequate, and caused weight lost.  Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992).  On more than one occasion, he maintains the food was not cooked properly or was spoiled; as a result of eating spoiled food, he asserts he had food poisoning and needed medical treatment.  Such claims are constitutionally actionable.

### (E).  No Actual Injury

Next, Defendants maintain they are entitled to judgment as a matter of law because there is no evidence Wilmoth suffered an actual, physical injury, which they maintain is necessary to

establish he did not receive nutritionally adequate meals. Defendants maintain there is no proof regarding Wilmoth's alleged weight lost. When this is considered along with Dr. Huskins' opinion that Wilmoth was in overall good condition as of September 2008, Defendants argue Wilmoth's claim fails.

I believe Wilmoth has adequately asserted a claim of denial of adequate food and nutrition. He has sworn under penalty of perjury that he lost twenty pounds as a result of an inadequate diet and suffered food poisoning.

### 4. Conclusion

For the reasons stated, I recommend that the Defendants' motion for summary judgment (Doc. 96) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 16th day of August 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE